**Grace CARTWRIGHT, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 762–86C.**

United States Claims Court.

Jan. 25, 1989.

George M. Peagler, Jr., Americus, Ga., for plaintiff.

Sheryl L. Floyd, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant. Greg Brady, Office of Justice Programs, of counsel.

## ORDER

NETTESHEIM, Judge.

This case comes before the court on cross-motions for summary judgment. Argument was held after the matter was transferred to this court for decision on October 4, 1988. Following argument on November 3, 1988, the case was remanded for additional findings. A supplemental administrative decision has been received, upon which the parties have commented.

Plaintiff Grace Cartwright ("plaintiff"), the widow of Lt. Wilson Cartwright, who until his death served as a corrections officer for the State of Georgia, seeks to recover the $50,000.00 survivor benefit available under the Public Safety Officers' Benefit Act, 42 U.S.C. §§ 3796–3796c (Supp. IV 1986) (the "PSOBA"). Plaintiff argues that the denial of survivor benefits by the Director of the Bureau of Justice Assistance (the "BJA") was arbitrary, capricious, and unsupported by the record. Defendant seeks affirmation of the Director's deci-

sion, arguing that the Director's denial of benefits was in conformity with applicable statutes and regulations, supported by substantial evidence, and neither arbitrary nor capricious.

## FACTS

The following facts are undisputed. On October 26, 1984, an inmate at the Middle Georgia Corrections Complex in Hardwick, Georgia, kicked corrections officer Lt. Cartwright in the chest and abdomen. Following the incident Lt. Cartwright sought medical attention for pain in the left side of his chest—first from the prison infirmary and then from the Baldwin County Hospital. While at the hospital, Lt. Cartwright's physicians discovered a chronic abdominal aortic aneurysm.[1] On October 31, 1984, Lt. Cartwright underwent surgery to remove the aneurysm. Due to the severity of complications resulting from the surgery, Lt. Cartwright was transferred to the Medical Center of Central Georgia, where he underwent repeated dialysis and two additional operations. "The last part of the course," wrote a physician reporting on the cause of Lt. Cartwright's surgeries, "was essentially desperation in heroics in a last effort to prevent his death from hemorrhage and shock." Despite numerous measures taken by doctors and nurses attending Lt. Cartwright, he died on November 26, 1984.

The death certificate issued for Lt. Cartwright listed his cause of death as "intractable shock, complications of surgery [and] abdominal aortic aneurysm."

On June 24, 1985, plaintiff filed a claim for survivor benefits under the PSOBA with the Claims Officer pursuant to 28 C.F.R. § 32.20 (1986). On October 1, 1985, the BJA informed plaintiff that her claim was denied because the law governing the PSOBA would not allow approval of her request.

On October 8, 1985, plaintiff appealed the BJA's adverse determination. A hearing was held on December 17, 1985, *see* 28 C.F.R. § 32.24(a), at which plaintiff presented documentary evidence and two witnesses who testified in support of her claim for benefits. On May 13, 1986, the Hearing Examiner issued a written decision stating that Lt. Cartwright's death was not a direct result of the inmate's attack.

Plaintiff appealed this decision to the Director of the BJA. By letter of July 11, 1988, the Director denied plaintiff's eligibility, *see* 28 C.F.R. § 32.24(i) (regarding finality requirement), from which decision plaintiff now appeals to this court.

## DISCUSSION

Section 3796(a) of the PSOBA provides for the payment of a $50,000 death benefit to the survivors of a Public Safety Officer who dies as a direct and proximate result of injuries sustained in the line of duty. For purposes of the PSOBA, " '[d]irect and proximate' " or " 'proximate' " means that the antecedent event is a substantial factor in the result. 28 C.F.R. § 32.2(d).

■ Review of agency decisions in PSOBA matters is limited. The role of a reviewing court is to make three inquiries as to the denial of survivor benefits: whether there has been substantial compliance with statutes and implementing regulations; whether government officials acted arbitrarily or capriciously in carrying out their duties; and whether there was substantial evidence in the record to support the decision of the BJA. *Morrow v. United States*, 227 Ct.Cl. 290, 296, 647 F.2d 1099, 1103, *cert. denied*, 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981); *Durco v. United States*, 14 Cl.Ct. 424, 427 (1988); *Tafoya v. United States*, 8 Cl.Ct. 256, 261 (1985).

### 1. *Procedural compliance*

Plaintiff does not complain that the agency failed to comply with the governing statute or implementing regulations. The record reveals that plaintiff requested and received review of her claim by government pathologists, a BJA Hearing Examin-

---

**1.** An aortic aneurysm is a permanent abnormal blood-filled dilatation of a blood vessel resulting from disease of the vessel wall.

er, and the Director of the BJA. No evidence suggests that plaintiff was denied an opportunity to present evidence or marshal arguments as to her eligibility for benefits. 28 C.F.R. § 32.24(c). Instead, plaintiff attacks the merits of the BJA's decision.

### 2. *Arbitrary and capricious agency action*

Plaintiff points to claimed errors of fact and law as evidence that the BJA acted arbitrarily and capriciously in denying her claim for survivor benefits.

Plaintiff first argues that Dr. Donald G. Wright, the consulting Army pathologist to the PSOBA Claims Officer, *see* 42 Fed.Reg. 23,260 (1977), erroneously found that the inmate's kicks did not injure Lt. Cartwright's aneurysm. Lt. Cartwright's surgeon, Dr. Hector Piza, testified by deposition that, although the kicks "could have" injured the aneurysm, he could find no evidence of injury as a result of the blows. Therefore, the record does not support plaintiff's objection.

Next, plaintiff contends that government pathologists overlooked the fact that Lt. Cartwright's fibrosis and inflammation—which ultimately complicated surgery—were the result of the kicks. Again, the record contradicts plaintiff's arguments. Regarding the cause of the fibrosis, both Dr. Piza and the physician who authored the "Report of Operation" concur in the opinion that Lt. Cartwright's retroperitoneal fibrosis was not the result of anything so recent as the inmate attack. The pathology of this type of scarring is better explained by chronic leaking of the aneurysm or as the result of hypertension.

There is considerable debate, however, as to the cause of Lt. Cartwright's inflammation. Dr. Piza, in the course of his deposition, takes both sides of the argument—first stating that there is no way to tell whether the inflammation was due to the aneurysm or the kicks and then testifying that there was a "causal connection" between the kicks suffered and the resulting inflammation. Dr. Charles W. Wickliffe, plaintiff's cardiology expert, agrees with Dr. Piza's testimony to the extent that one cannot be certain that the inflammation resulted from the inmate's kicks.

The dispute among the experts is only a secondary matter. Plaintiff claims error based on the government pathologists' failure to consider all of the evidence. However, just because government pathologists disagree with plaintiff's theory regarding the source of the inflammation, it does not follow that they failed to consider all the relevant evidence. In fact, the deposition testimony of Dr. D.A. Pinero, Jr., a pathologist who testified for the State of Georgia in related proceedings, reveals that the blows to Lt. Cartwright's abdomen were considered, and rejected, as a possible cause of the inflammation.

As her third point, plaintiff argues that the Hearing Officer did not accord enough weight to the testimony of doctors who treated Lt. Cartwright. The Claims Court continues to hold, however, that the weight to be accorded testimony received is within the province of the PSOBA fact-finder. *Durco*, 14 Cl.Ct. at 428. Plaintiff cites no authority that would support a contrary conclusion.

Plaintiff also claims that the Hearing Officer based his entire decision upon Dr. Wright's summary analysis. A fair reading of the Hearing Officer's "Commentary" demonstrates that he had a command of the issues and record reaching far beyond the minimal information contained in Dr. Wright's summary. It is clear that the Hearing Officer considered plaintiff's evidence, even though he reached different conclusions. As with plaintiff's argument concerning Dr. Pinero's testimony, plaintiff erroneously equates a difference of opinion with closed-mindedness.

Finally, plaintiff contends that the Hearing Officer did not consider the "cause and effect" relationship between the kicks and the inflammation suffered. Sections 1 and 2 of the Hearing Officer's "Commentary" show that the effect of the inflammation, as a cause of death, was considered. The issue becomes whether the Hearing Officer's conclusion that the connection was not significant is supported by substantial evidence.

### 3. *Agency denial based upon substantial evidence*

The question for this court is not whether plaintiff could convince a reasonable person of her entitlement, but whether the BJA's denial of survivor benefits is adequately supported by the record. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938). Thus, even though plaintiff might be able to convince a reasonable person that her version of the facts is plausible, such a showing is not enough for the court to rule in plaintiff's favor. *Consolidated Edison Co., id.*

Lt. Cartwright's medical records indicate a variety of health problems which predate the inmate attack. First, Lt. Cartwright was overweight, standing 6 feet 4 inches tall and weighing 270 pounds. Second, he was a heavy smoker. Third, Lt. Cartwright suffered from hypertension and had long complained of bringing up sputum each morning. Finally, the record makes reference to the fact that Lt. Cartwright had been under a doctor's care for having passed a kidney stone.

Upon admission to Baldwin Hospital, Lt. Cartwright was discovered to have a large aortic aneurysm. The medical consensus was that the aneurysm was pre-existing and not caused by the inmate's kicks. As Dr. Piza testified, the size of the aneurysm on Lt. Cartwright's artery was 10 centimeters in diameter—or, as Dr. Wickliffe described it, the size of a small grapefruit. An aneurysm of this size is so dangerous that medical students are not normally allowed to palpitate them, for fear they may rupture. Indeed, Dr. Piza recounted that of the hundreds of aneurysms he had seen throughout his career, only ten may have been as large as Lt. Cartwright's.

Lt. Cartwright's aneurysm posed such a grave health risk that his physicians recommended immediate surgery to correct the condition. On October 31, 1984, he underwent a long and difficult procedure lasting 14 hours and requiring over 22 units of blood. Following Lt. Cartwright's transfer to the Medical Center of Central Georgia, two additional surgeries were performed in an attempt to stave off massive internal bleeding—a vagotomy on November 11 and then a total gastrectomy on November 16, 1984.

Despite the "heroic efforts" made to save Lt. Cartwright, there is substantial evidence in the record on which to base a finding that the complications which led to his untimely death were not the result of the kicks he suffered in the line of duty.

The Hearing Officer, based upon the deposition testimony of Drs. Piza and Wickliffe, determined that the kicks to Lt. Cartwright's chest and abdomen caused inflammation in the vicinity of the pre-existing chronic abdominal aortic aneurysm. Although neither doctor testified as to a causal effect with reasonable medical certainty, 28 C.F.R. § 32.4 requires the Bureau of Justice Assistance to "resolve any reasonable doubt arising from the circumstances of the officer's death in favor of payment of the death benefits." Therefore, the Hearing Officer postured the kicks as having caused the inflammation and focused his inquiry on whether the inflammation resulting from the kicks "made a significant contribution to the death."

28 C.F.R. § 32.2(d) requires that the "traumatic injury," the kicks, be a "substantial factor in the result." The Hearing Officer states that he relied on the evidence presented by two pathologists: Drs. Pinero and Wright. Dr. Pinero, who testified by deposition dated September 11, 1985, taken before the Georgia State Board of Worker's Compensation, does not address the issue of inflammation, since the operative findings of the surgeon (Dr. Piza) and the autopsy report, made weeks after the first surgery performed by Dr. Piza, do not make mention of the inflammation. It is significant for the reasons stated above that Dr. Pinero did not address the possible role of inflammation. This is not a deficiency in the evidence given by Dr. Pinero, but suggests a limitation to it.

Because Dr. Pinero does not mention inflammation, the court was concerned with the Hearing Officer's reliance on the evidence given by the other pathologist—the report of Dr. Wright. Dr. Wright ad-

dressed the following five questions put to him by letter dated January 30, 1986, from the Hearing Officer:

1. What was the effect of the kicks that Lt. Cartwright received?

2. Did the officer have one or more chronic, congenital, or progressive cardiac, pulmonary, other diseases, or special conditions that were contributory to his death or that were factors in the process that led to his death? If so, what were they?

3. What were the effects of the above diseases or conditions upon the officer?

4. What was the probable cause of the officer's death?

5. Were the kicks a substantial factor in his death? If yes, how?

Pertinent to the November 7, 1988 limited order of remand were Dr. Wright's answers to questions 1. and 5., as follows:

1. The kicks that Lt. Cartwright received brought attention to the abdominal aneurysm that was present. No evidence indicates injury to the aneurysm at the time of kicking. This is supported by the operative report which does not reveal contusions or hemorrhage to the aneurysm or surrounding tissues.

. . . .

5. The kicks were not a substantial factor in his death. The pain caused the aneurysm to be discovered but did not result in the many complications of surgery which caused Lt. Cartwright['']s death.

Unlike Dr. Pinero, Dr. Wright stated that he had reviewed the depositions, as well as the medical records, narrative summaries, and operative reports on Lt. Cartwright's case. Dr. Wright thus was in a position to comment specifically on (1) Dr. Piza's deposition testimony that the latter observed "acute inflammation" during the initial operation to correct Lt. Cartwright's aneurysm and (2) Dr. Piza's opinion (in response to a leading question from plaintiff's coun-

sel) that the swelling in the area of the aneurysm aggravated or made the repair procedure more difficult. Dr. Piza also testified that he had never seen that amount of inflammation on a regular atherosclerotic aneurysm. Dr. Wickliffe's opinion that the blows were responsible for aggravating the underlying abdominal aneurysm is predicated on Dr. Piza's finding of acute inflammation. To this extent, Dr. Wickliffe's evidence is directly derivative of Dr. Piza's. However, Dr. Wright, the only witness on whom the Hearing Officer relied who reviewed these depositions, was not asked to comment as to whether the inflammation, to the extent that it resulted from a traumatic injury, was either the cause of or made a significant or substantial contribution to the death.[2]

The court ordered a limited remand, since the Hearing Officer had found that the inflammation resulting from the kicks was a possible link in the causation chain which would lead to the payment of the benefit to plaintiff and the witnesses upon which he relied did not address the issue. Therefore, Dr. Wright, the only witness on whom the Hearing Officer relied who reviewed all the depositions, was asked to comment as to whether the inflammation, to the extent that it resulted from the traumatic injury, was either the cause of or made a significant or substantial contribution to the death.

Dr. Wright confirmed the absence of any evidence linking the inmate attack to later surgical complications. For the purposes of the remand, Dr. Wright reviewed the operative report, the Baldwin County Hospital's pathology report, and the Medical Center of Central Georgia's autopsy report. In his letter responding to the remand order, Dr. Wright pointed out that, although the depositions and written reports do mention inflammation and an increased difficulty of repair, they do not mention acute inflammation, hemorrhaging, or bruising in the vicinity of the aneurysm, nor do they refer to bleeding from the aneurysm itself.

2. The autopsy report of Charles P. Maurizi, M.D., performed on November 27, 1984, does

not contribute significantly to the resolution of this particular issue.

Thus, without some evidence of recent trauma to the aneurysm or to the area surrounding the aneurysm, Dr. Wright found it impossible to consider the kicks to Lt. Cartwright's chest a substantial factor in his death. The Hearing Officer adopted Dr. Wright's opinion.

For the reasons stated above, the BJA's denial of survivor benefits was reasonable, in accord with established procedures, and based upon substantial evidence in the record.

## CONCLUSION

Based on the foregoing, plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted. The Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

No costs.

